McVAY v. SWIFT et al.

No. 756.

District Court, W. D. Louisiana, Opelousas Division.

June 2, 1938.

Doty & Doty and A. S. Johnston, Jr., all of Biloxi, Miss., and Lewis & Lewis, of Opelousas, La., for complainant.

Dubuisson & Dubuisson, of Opelousas, La., for respondents.

DAWKINS, District Judge.

Plaintiff, a citizen of Mississippi, brought this suit against Charles H. Swift, a citizen of Illinois, C. T. Whitman and C. T. Whitman Lumber Company, Inc. (hereafter called the Lumber Company), citizens of Louisiana, and prayed that defendants account for amounts received for timber sold off certain lands for "grass rentals, trapping rights, mineral leases and rentals for

farming" on said lands since April 6, 1928 to the date of the filing of this bill; also an accounting for timber sold "from November 27, 1920 to April 6, 1928" at $5 per thousand feet, and showing how much thereof was paid to defendant Swift, "with the dates thereof"; that defendant be enjoined from selling or encumbering said lands; that all indebtedness due by the Lumber Company to Swift be held to have prescribed, "and the alleged vendors lien and special mortgage securing said indebtedness perempted"; and that the sheriff's sale and purchase by Swift of said lands all be declared null and void.

"And further that the judgment in favor of plaintiff and against the defendant C. T. Whitman Lumber Company, Inc., be decreed to be a judicial mortgage on the lands described in said Bill and superior lien on said lands, except as to taxes due the State of Louisiana and the Parish of St. Landry; and that plaintiff may be authorized to proceed upon his judgment by writ of fieri facies issued in the manner provided by law, or issue another writ thereon, as this Court may deem necessary; and that the Marshal of this District be directed to proceed to levy upon, advertise and sell said premises described herein for the payment and satisfaction of Plaintiff's said judgment, interest and costs.

"And, if mistaken in the relief specially prayed for herein, then for all such general and equitable relief to which plaintiff is entitled, and for which he will ever pray.

"And, in the alternative, if mistaken in the relief prayed for, then that the Court hold that amount of money paid under the sale by Act under Private Signature from Charles H. Swift to Hamp A. Morrison, and from Hamp A. Morrison, Inc. to C. T. Whitman Lumber Company, Inc., be credited on the purchase price of the lands described in said Bill at the rate of $20.00 per acre, and that the number of acres thus paid for be released from the said special mortgage and vendor's lien, and that a lien be fixed in favor of plaintiff on said lands, and the same sold as under execution in the manner provided by law for the satisfaction of said Decree, interest and costs accrued and to accrue under execution."

The petition alleged that on May 29, 1936, plaintiff had obtained judgment against the C. T. Whitman Lumber Company, in the sum of $84,474.58, with interest at 5% per annum from said date; and that said indebtedness accrued to plaintiff on December 31, 1928, at which time said Lumber Company owned the said lands in fee simple.

Further, that on May 20, 1933, in the state court for St. Landry Parish, in cause No. 26337, Swift had obtained judgment against the Lumber Company "for the sum and amount of $30,272.27, and a lien fixed on said lands", as per copy of judgment made part of the bill; that at the time of filing the foreclosure by Swift, the present complainant's claim against the Lumber Company "was in writing and of record on the land records of St. Landry Parish * * * and plaintiff was, therefore, a perforce and necessary party to said suit" of defendant Swift, against the said Lumber Company; that on June 6, 1933, the said lands were seized by the sheriff, subsequently sold and bid in by Swift, for the sum of $26,345, which, according to the sheriff's return, was settled for as follows:

"The Adjudicatee, being the seizing creditor, paid the costs of court, and of the sale, amounting to the sum of $340.84; judgment of the Texas & Pacific Company against the said C. T. Whitman Lumber Company, amounting to the sum of $225.32 and that of Flournoy & Beasley against said company, amounting to the sum of $693.94, and of the balance he applied $10,893.39 to the payment of the taxes of 1930, 1931 and 1932, and the remainder, being the sum of $14,192.41, he applied as a credit on his special mortgage and vendor's privilege of $138,176.68 bearing on said property."

That since said date, Swift had recorded title to said property, although C. T. Whitman "present President and General Manager of said Lumber Company has never been out of possession of said lands since they were acquired by it on November 20, 1920"; that the present plaintiff had caused a writ of fi fa to issue on its judgment against the Lumber Company for the seizure of said lands, but that Swift "caused a motion to be filed in this court to set aside said decree, in so far as said lands were concerned, and to permit him to plead in said cause", and that said motion of Swift was finally sustained in so far as he personally and said lands were concerned, with reservation of the right to plaintiff, McVay, "to file a creditor's bill against said lands, as creditor of the Lumber Company", as will appear from the final decree of the Court of Appeals for this circuit.

Further, that the decision of the Court of Appeals, 5 Cir., 91 F.2d 208, was handed down on July 6, 1937, and on the 31st day of the same month, plaintiff filed the present bill, which was within one year "from the rendition and signing of the judgment against the defendant, C. T. Whitman Lumber Company, Inc., in favor of the defendant Charles H. Swift, on an alleged vendors lien and second mortgage, and the defendant Charles H. Swift and C. T. Whitman Lumber Company, Inc. and C. T. Whitman, were made parties to said suit, being cause No. 605 in equity; that complainant's final decree against the Lumber Company "was properly served * * * and recorded in the mortgage records of St. Landry Parish * * * in book No. ———— page ————, and became a judicial mortgage against whatever interest" the Lumber Company "had and has in said lands"; that the judgment in favor of Swift against the Lumber Company "was null and void as to plaintiff" and that of complainant so recorded is superior to that of Swift; and that the writ of fi fa in plaintiff's favor is still in the hands of the marshal of this court, unsatisfied "in whole or in part".

Plaintiff then proceeded to attack the judgment and execution sale in favor of Swift & Company. It is alleged that the same was for the purpose of defrauding the complainant, and "defeating the collection of his debt" from the Lumber Company "out of said lands" and further created an unfair and illegal preference, rendering the same null and void and the said lands are now held in trust by said defendant Swift for the Lumber Company, "for the purpose of preventing a levy and sale of the same and by virtue of said execution" against the said Lumber Company.

Further, that the defendant Lumber Company "breached its contract with plaintiff on December 31, 1928", and plaintiff obtained a final decree for damages in the sum of "$63,959.50, at the rate of $3.50 per acre, which was the profit plaintiff then had in said lands, plus interest at the rate of 5% per annum from December 31, 1928, or $20,519.08, thereby making the sum total of $84,474.58, and that plaintiff was a creditor of" the Lumber Company "long before the rendition of the judgment and the pretended foreclosure of the defendant" Swift, and was, therefore, entitled to notice and a necessary party to said foreclosure proceedings; that the Lumber Company and Whitman, personally, were, to the knowledge of Swift, insolvent at the time of the rendition of said judgment in his favor "and possessed of no property other than that so fraudulently conveyed to said defendant * * * Swift, under said pretended foreclosure, because the indebtedness sued on was prescribed and the alleged vendor's lien and special mortgage was perempted." Plaintiff then quotes articles of the Code which he claims support the pleas of prescription and peremption.

The plaintiff further alleged that the act of sale by Swift to Hamp A. Morrison, of April 6, 1920, in which cash and notes were given for the purchase price (the Whitman Lumber Company having on the 27th day of November of the same year, purchased from Morrison "subject" to the indebtedness due Swift) provided, under certain conditions, acreage should be released from the mortgage for payments made, the bill quoting from the deed the provisions mentioned, and alleging that the whole act was annexed and made a part thereof; that the Lumber Company paid all but a small part of the purchase price, and under said stipulation "over 16,000 acres of the lands" had been released from the effect of the mortgage when Swift filed his suit of foreclosure in the state court; further, that Swift collected from the Lumber Company "all of the unpaid purchase price" but failed and refused to release any of said acreage from the "pretended" lien and mortgage "and thus perpetrated a fraud on plaintiff as a creditor" of the Lumber Company, all of which "was kept off the land records of St. Landry Parish * * * concealed from plaintiff, and therefore said defendant collusively or otherwise confederated and conspired to keep the knowledge of said released acreage from plaintiff, until such time as his right of action against the defendant" Lumber Company "was barred and prescribed under the law of Louisiana."

Further, that in addition to the money collected from the Lumber Company, Swift had collected various amounts "for grass leases, stave leases, trapping rights and leases and oil and gas and mineral leases, on said land * * *, amounting to many thousands of dollars", which together with the moneys paid by the Lumber Company "more than paid the purchase price of said lands", and for which reasons the pretended foreclosure "was a sham and fraud on the rights of plaintiff", by Swift

in collusion with said Lumber Company, and its president, C. T. Whitman, "to defeat the collection by plaintiff of the amounts of its debt against them".

Further, that at the time of the sale by the sheriff, the said lands were actually worth $146,184, but were sold for $26,345, or less than 20% of their actual value; that all of said lands are in the Atchafalaya basin, and the "estimated value of flowage rights and options under the Flood Control Act of Congress" was $73,092; that the rental value for mineral development or leases is $25 per acre, or $456,925, and making a total valuation of $676,101; that Swift knew of said values at the time of the foreclosure in the state court and fraudulently and collusively conducted said proceedings in order to take the title out of the Lumber Company and place the same beyond the reach of complainant, to prevent the collection of his claim in damages for breach of the contract.

Plaintiff further alleged that the claimed indebtedness of Swift against the Lumber Company had prescribed under Article 3540 of the Revised Civil Code, and that the mortgage had perempted under Article 3369 of the same Code, and were extinguished under special provisions of Art. 3411 of the Code, all of which he pleaded against Swift as establishing the nullity of his judgment and foreclosure proceedings in the state court in 1933, in so far as they affected plaintiff.

Further, that plaintiff had no knowledge of said proceeding of Swift against the Lumber Company, in the state court, "until shortly before filing his original bill in equity cause No. 605" on the docket of this court, and he "filed said bill immediately and within one year from the rendition of said judgment"; that no appraisement was made of the lands in the said state court proceedings, "as required by law", and the same were adjudicated to Swift "for less than 20% of their actual value"; and that the sheriff's deed fails to show that said property brought two-thirds of the appraised value, as required by the law of the state, and for all of which reasons the said proceedings were null and void as against complainant.

Defendant Swift answered the bill, admitting that plaintiff had obtained a "final decree pro confesso" against the Lumber Company for the amount alleged but averred that the said decree so obtained was based on incompetent and inadmissible evidence, and that plaintiff was not really a creditor of said Lumber Company at the time he obtained said judgment. Defendant also denied that the Lumber Company was the owner of said lands on May 29, 1936 (the date of the decree pro confesso) "or at any time since"; that on May 28, 1928, plaintiff had obtained from the Lumber Company an option to buy said lands on the terms therein set forth, "but that he never exercised his option in the manner required by law within the time stipulated in said option * * *"; that defendant was the owner of said lands by virtue of sheriff's deed, dated August 9, 1933, and recorded the same day, made in execution of Swift's demand against the Lumber Company. He averred that he had obtained a valid judgment against the Lumber Company upon tax subrogations from the state, with a lien for those of 1930, 1931 and 1932; that the said Lumber Company had failed to pay taxes for the years 1924 to 1932 inclusive, in amounts aggregating $30,272.27, and the same were paid by respondent and that in addition to the legal subrogation enjoyed by him, he held "conventional subrogations, executed by the sheriff and ex-officio tax-collector * * *"; he denied that his suit in the state court was for the purpose of foreclosing a vendor's lien and special mortgage, "but was based on tax subrogations. * * *", and averred further that plaintiff was not a necessary party to said suit; denied that the Lumber Company had been in possession of said property since his purchase, but that since that date "C. T. Whitman had been employed individually * * * as keeper and care-taker thereof * * * for a monthly stipend paid to him by respondent"; denied that the plaintiff had obtained a lien upon the lands in question by virtue of its decree pro confesso, and averred that the same had been ordered canceled and erased in so far as respondent was concerned, by the judgment of this court, which was affirmed by the Circuit Court of Appeals, 5 Cir., 91 F. 2d 208; and that the plea of prescription as to respondent's claim against the Lumber Company, came too late, since in order to affect it, the same had to be asserted in the proceeding in which the judgment was obtained by him in the state court.

Respondent further averred that all three of the vendor's lien and special mortgage notes which he held against said

property had been kept alive by repeated partial payments and were in that condition at the time of the institution of his suit and when the sheriff's sale referred to by plaintiff was made; he admitted that the mortgage had not been reinscribed "until May 17, 1933", and that all valid mortgages or other encumbrances that "existed against said property at the time of the reinscription passed ahead of them and primed them, and that is why such mortgages were paid out of the price of the adjudication of said property"; that at the time of said sale there was no "real encumbrances on said property in favor of plaintiff" for the reasons stated, "and there was no apparent encumbrances for the reason that while plaintiff recorded his option contract in the conveyance records * * * he did not cause said option contract to be recorded in the mortgage record * * *".

Respondent further denied that either Hamp A. Morrison, his vendee, or the Lumber Company "ever complied with the conditions imposed by his deed * * * for the relinquishment of any special acreage" from the lien and mortgage which bore upon the whole; that at the time of the sheriff's sale there was a balance due to respondent of $138,176.68 on said obligations; and he specially denied any concealment, collusion or fraud as to plaintiff "for the simple reason, among others, that respondent never knew of the existence of the option contract of May 28, 1928, or of its alleged breach on December 31, 1928" by the Lumber Company, "until after the final decree pro confesso of May 29, 1936 * * *".

Otherwise respondent denied generally and specially the allegations of the bill.

As affirmative defense, respondent pleaded the exception of no cause of action and prescription under Arts. 1987 and 1994 of the Civil Code.

He prayed that the bill be dismissed with costs.

### Finding of Facts.

On April 6, 1920, the respondent, Charles H. Swift, being then the owner, sold the lands the subject of this suit to Hamp A. Morrison, for the price of $413,022.55, of which $103,272.55 was paid in cash, and for the balance, the purchaser executed his three notes, secured by vendor's lien and special mortgage upon the property in the sum of $103,250 each, of the same date and maturing on or before one, two and three years, respectively, thereafter. Payment of each of the three notes was guaranteed by C. T. Whitman Lumber Company and C. T. Whitman, individually, in the following language:

"For value received, we or either of us hereby guarantee the payment of the within note at maturity, or at any time thereafter, and agree to pay all costs and expenses incurred in collecting the same, waiving demand of payment, protest and notice of protest, and consent without notice to any extension of time by the holder."

This indorsement was not dated but was made in the early part of 1921. The Act contained the following special provisions, which are relied on in certain phases of the present controversy:

"The said appearer, Chas. H. Swift, agrees that the said purchaser shall have the right to cut and remove the timber from the property so conveyed upon the payment to the said Chas. H. Swift of the holder or holders of said notes, the sum of Five Dollars ($5.00) for each 1000 feet of timber so cut and scaled, and the said purchaser shall, within ten days after the expiration of each ninety day period, from the date of this instrument, furnish the said Chas. H. Swift a full and complete statement of the amounts of timber so cut and scaled within the said ninety days period, and with said statement a remittance shall be made of $5.00 for each and every 1000 feet of timber so cut and scaled; and the said purchaser agrees that the said appearer Chas. H. Swift, or his accredited agent or agents, shall have access to the books of said purchaser, to examine and determine the amount of timber so cut and scaled, if he so desires at all convenient times.

"And the said appearer, Chas. H. Swift, agrees upon request of the purchaser, that after the merchantable timber shall have been cut therefrom, to execute and deliver to him a release or releases of the lien retained and granted in this act of sale, upon payment by the said purchaser of the sum of Twenty Dollars ($20.00) per acre for each and every such acre so requested to be released from said lien.

"It is understood and agreed that all payments for timber cut or for lands released from the lien retained and granted

in this act shall be credited upon the note or notes given, last becoming due and payable."

Payments were made and subsequently entered upon the backs of the three notes as follows:

The note first maturing one year after date:

"1/10/21 and 1/17/21 Int. paid on within note to 10/6/20

| Date | | | | Amount |
|------|---|---|---|--------|
| 3/31/21 | Paid on Note | | | $ 15,000.00 |
| 4/18/21 | " | " | " | 7,000.00 |
| 5/2/21 | " | " | " | 4,000.00 |
| 6/27/21 | " | " | " | 5,000.00 |
| 9/22/21 | " | " | " | 2,800.00 |
| 10/3/21 | " | " | " | 8,583.33 |
| 2/8/22 | " | " | " | 4,000.00 |
| 4/4/22 | " | " | " | 8,833.33 |
| 4/12/22 | " | " | " | 3,750.00 |
| 6/10/22 | " | " | " | 3,750.00 |
| 11/11/22 | " | " | " | 9,083.33 |
| 4/10/23 | " | " | " | 2,500.00 |
| 4/17/23 | " | " | " | 9,333.33 |
| 5/10/23 | " | " | " | 2,000.00 |
| 7/9/23 | " | " | " | 3,000.00 |
| 10/8/23 | Paid on Note | | | 9,583.33 |
| 4/9/24 | " | " | " | 2,500.00 |
| 5/9/24 | " | " | " | 2,512.30 |
| 6/9/24 | " | " | " | 20.85 |

$103,250.00"

The note maturing two years after date:

"1/10/21 and 1/17/21 Interest paid on within note to 10/6/20

| Date | | | | Amount |
|------|---|---|---|--------|
| 6/9/24 | Paid on Note | | | $ 2,504.15 |
| 7/10/24 | " | " | " | 4,235.76 |
| 9/9/24 | " | " | " | 5,122.50 |
| 10/6/24 | " | " | " | 10,083.33 |
| 10/16/24 | " | " | " | 45.99 |
| 1/16/25 | " | " | " | 4,364.00 |
| 3/16/25 | " | " | " | 7,500.00 |
| 4/12/25 | " | " | " | 10,333.33 |
| 10/5/25 | " | " | " | 10,583.33 |
| 4/7/26 | " | " | " | 10,833.33 |
| 5/5/26 | " | " | " | 583.97 |
| 6/15/26 | " | " | " | 659.16 |
| 7/20/26 | " | " | " | 500.00 |
| 7/28/26 | " | " | " | 518.84 |
| 8/25/26 | " | " | " | 500.00 |
| 9/14/26 | " | " | " | 500.00 |
| 10/14/26 | " | " | " | 11,083.33 |
| 10/14/26 | " | " | " | 694.85 |
| 11/15/26 | " | " | " | 500.00 |
| 12/13/26 | " | " | " | 500.00 |
| 1/15/27 | " | " | " | 500.00 |
| 2/18/27 | " | " | " | 124.00 |
| 2/24/27 | " | " | " | 500.00 |
| 3/11/27 | " | " | " | 355.21 |
| 3/14/27 | " | " | " | 7,500.00 |
| 3/16/27 | " | " | " | 30.05 |
| 3/20/27 | " | " | " | 500.00 |
| 4/12/27 | " | " | " | 10,963.31 |

$103,250.00"

The note maturing three years after date:

"7/22/20 Paid on Note  $ 5,163.81 a/c timber removed
11/22/20 " " "  3,002.02 " " "
1/10/21 " " "  700.00 " " "
1/10/21 and 1/17/21 Int. Paid to 10/6/20
2/14/21 Paid on Note  7,000.00
4/20/21 " " "  3,561.51
7/28/21 " " "  4,013.20
10/24/21 " " "  5,217.89
1/12/22 " " "  5,010.75
3/13/22 " " "  3,619.06
4/28/22 " " "  668.83
7/31/22 " " "  860.18
10/16/22 " " "  1,574.98
1/18/23 " " "  1,507.42
4/20/23 " " "  1,979.12
6/13/23 " " "  1,370.86
6/28/23 " " "  1,622.55
7/26/23 " " "  1,779.54
11/24/24 " " "  2,000.00
3/9/25 " " "  20,000.00
7/6/25 " " "  1,669.41
2/7/26 " " "  570.09
5/11/26 " " "  402.80
4/12/27 " " "  370.02
7/15/27 " " "  4,718.25
1/20/28 " " "  200.00
3/7/28 " " "  377.05
4/4/28 " " "  250.00
10/24/28 " " "  268.42
11/5/28 " " "  101.79

$79,579.55"

The indorsements of these payments on the several notes were not made until the spring of 1933, when they were sent to attorneys at Opelousas for preparation of the suit of Swift against the Lumber Company, which was filed in the state court, but were carried on the books and records of Swift.

The Lumber Company defaulted in the payment of taxes for the year 1924, and the property was sold to the state, but was redeemed with money furnished by Swift in 1926, in the sum of $2,400.49. Thereafter, Swift paid taxes on the lands as follows:

| | |
|---|---|
| 1925 | $ 4,347.20 |
| 1926 | 3,321.95 |
| 1927 | 3,510.96 |
| 1928 | 3,839.45 |
| 1929 | 3,943.75 |
| 1930 | 3,547.60 |
| 1931 | 3,343.21 |
| 1932 | 3,388.33 |
| 1932 | 79.92 |
| Total | $29,322.37 |

On the back of each tax receipt was indorsed by the sheriff and tax collector, in substantially the same form, the following subrogation:

"Opelousas, La., May 26, 1926.

"I hereby subrogate Chas. H. Swift, who has paid the within tax detailed on the reverse hereof after the same had become delinquent and advertised for sale, to all the liens and mortgages of the State of Louisiana and the Parish of St. Landry, and all other taxes thereon, incident to, or growing out of said taxes, and its recordation in the office required by law.

"[Signed] W. D. Lastrapes,
"Dy. Tax Collector."

On April 18, 1933, Charles H. Swift filed his petition in the state court against the Lumber Company for reimbursement of taxes paid for the years 1924 to 1933 inclusive, aggregating $30,272.27, and claiming both legal and conventional subrogation of the state's lien, and on May 20, 1933, took a default judgment for the amount demanded, with 10% interest from date of payment by him of the taxes for

each of said years until paid with "subrogation to all the rights of the State of Louisiana and its political subdivisions to enforce the payment of same in principal and interest upon the following described property" being the lands in question. Notwithstanding this general lien, the judgment in its concluding paragraphs further recited that the plaintiff should have "a lien, privilege and legal mortgage" on the lands "as subrogee of the State" and its political sub-divisions, "to secure the payment of the taxes of 1930, 1931 and 1932, in principal, interest, costs and charges", describing in detail the items for those years, as shown by the copy of said decree filed on the trial of this case, and which is made part of this finding of fact by reference. This judgment was recorded in the mortgage records of St. Landry Parish, May 20, 1933.

On June 5, 1933, a writ of fi fa was issued to the sheriff, commanding him to seize the defendant's property for its satisfaction and reciting in detail the several items of the judgment, interests, costs, subrogation, etc. The lands were seized and sold accordingly. In the meantime, on June 20, 1933 Swift made an agreement with the Lumber Company, that it should be permitted to buy the property back by paying to him all amounts due, including principal, interest, attorney's fees, taxes and expenses, etc., if said privilege was exercised within sixty days after Swift acquired title thereto under said writ of fi fa.

In his return, dated August 9, 1933, the sheriff, after reciting the seizure, advertising, etc., declared:

"And said property having been appraised on July 15, 1933, before the sale, by G. C. Jordan, appraiser appointed by defendant, and I. R. Guidry, appraiser, appointed by plaintiff, and duly sworn, at the sum of $39,514.00 as shown by the report of said appraisers hereto annexed and made part hereof and marked 'Exhibit B'".

* * * * * * * * * * * * *

"When Charles H. Swift, seizing creditor, being the last and highest bidder, I adjudicated said property to him for the price and sum of $26,345.00, the same being more than two-thirds of the appraisement. Said price of adjudication was settled for as follows:

"1. The purchaser paid the costs and charges of suit and sale amounting to the sum of $340.84 as shown on subjoined itemized list.

"2. And the purchaser being the plaintiff in this suit, and the holder of all the privileges and mortgages bearing on said property except the judgment in favor of the Texas & Pacific Railway Co. amounting to the sum of $154.00 with legal interest from November 18, 1925, until paid, together with all costs of suit, aggregating $225.32 and the judgment in favor of Flournoy & Beasley for the sum of $517.62 with legal interest from March 10, 1927, until paid, and all costs of suit, aggregating $693.04, as shown by said certificate of mortgage, which he has assumed and paid, and the balance of the purchase price, amounting to $25,085.80, I attributed, first to the taxes of 1930, 1931 and 1932 included in the judgment of the seizing creditor, and amounting in principal, interest and costs to the sum of $10,893.39, and, secondly, in reduction of the mortgage held by the seizing creditor, all as shown on subjoined statement captioned Distribution."

The distribution sheet is as follows:

"Distribution.

Proceeds of sale

Amount and Order or Rank of the Privileges and Mortgages Bearing on the Property Sold.

I.

Costs and charges as above detailed $ 340.54

II.

Charles H. Swift, seizing creditor, that portion of his judgment covering the taxes of 1930, 1931 and 1932 which is secured by first lien and privilege on the property sold, as follows:

1. Taxes of 1930:
Principal $3,532.90
Int. at 10% from 1/1/31 to 7/15/33 897.92
Costs 1.00 $4,431.82

2. Taxes of 1931:
Principal 3,343.21
Int. at 10% from 1/1/32 to 7/15/33 515.41
Costs .50 3,859.12

3. Taxes of 1932:

| | | |
|---|---|---|
| Principal | 2,468.25 | |
| Int. at 10% from 1/1/33 to 7/15/33 | 133.70 | |
| Costs | .50 | 2,630.45 |

### III.

Texas & Pacific Railway Co. Judgment:

| | | |
|---|---|---|
| Principal | $154.00 | |
| Int. at 5% from 11/18/25 to 7/15/33 | 58.97 | |
| Costs | 12.35 | 225.32 |

### IV.

Flournoy & Beasley Judgment:

| | | |
|---|---|---|
| Principal | $517.62 | |
| Int. at 5% from 3/10/27 to 7/15/33 | 164.27 | |
| Costs | 11.15 | 693.04 |

### V.

Charles H. Swift, Seizing Creditor:

Balance due on vendor's privilege and special mortgage:

| | |
|---|---|
| 1st. note, bal. due on 7/15/33 | $ 17,958.80 |
| 2nd. note, bal. due on 7/15/33 | 50,314.69 |
| 3rd. note, bal. due on 7/15/33 | 69,903.19 |
| | $138,176.68 |

### VI.

Charles H. Swift, Seizing Creditor:

Judgment which is the subject of this execution, $43,574.62, less $10,893.39 ........ 32,681.23

Total ............ $183,010.50

"The price of adjudication was applied to the payment of the costs, $340.84; the taxes of 1930, 1931 and 1932, $10,893.39; the judgment of the Texas & Pacific Railway Co., $225.32; and Flournoy & Beasley, $693.04; and the balance of $14,192.41 as a credit on the seizing creditor's mortgage of $138,176.68."

On the same date, August 9, 1933, the sheriff executed a deed to Swift under said sale, which was recorded on the same day.

There had previously been recorded in the mortgage records of St. Landry Parish tax subrogations in favor of Swift and against the Lumber Company, as follows:

| | |
|---|---|
| May 12, 1927 | $3321.95 |
| May 15, 1928 | 3510.96 |
| June 29, 1929 | 3899.95 |
| June 6, 1930 | 3943.75 |
| Feby. 18, 1931 | 3547.60 |
| Feby. 13, 1932 | 3343.21 |
| Feby. 9, 1933 | 2388.33 |

On May 17, 1933, there was also recorded in the mortgage records of said Parish the original act of sale by Swift to Morrison of the property.

On May 28, 1928, the Lumber Company and plaintiff McVay signed a contract or option, from which the following is quoted:
"The State of Louisiana,
"Parish of St. Landry.

"This agreement made and entered into' by and between C. T. Whitman Lumber Company, a corporation, by C. T. Whitman, President, by virtue of authority of its Board of Directors dated March 17th, 1928, party of the first part, and W. A. McVay, party of the second part, Witnesseth:

"Party of the first part, for and in consideration of One Dollar, cash in hand paid, and other good and valuable considerations, does hereby grant, unto party of the Second Part an option to purchase the following lands in the Parish of St. Landry, State of Louisiana—The same lands described in that certain oil and gas lease dated March 24th, 1928 between party of the first part and party of the Second Part, and attached hereto, at and for the price of $91365.00 of which $5000.00 is to be paid in cash, and the balance of $86365.00 to be paid in five equal annual installments of $17273.00 each, bearing interest at the rate of 6% per annum from date of notes until paid. This option to expire on the first day of January 1929.

"In the event party of the Second Part exercises this option, within the time stated herein, party of the first part will furnish to party of the second Part a certain abstract of title to said property showing a good merchantable title thereto, and will convey said property to party of the second part, or to any person designated by him, by a general warranty deed, in which a vendor's lien shall be retained to secure the payment of the deferred payments.

"In the event party of the Second Part exercises his option to purchase this property, party of the first part will thereafter release any portion thereof from the operation of the lien to secure the deferred payments, upon the payment to party of the

first part of the balance due upon the portion sought to be released by party of the second part.

"The lands covered by this option are known as the Charles H. Swift lands.

"Party of the first part reserves all timber on the W½ of Sec. 11 and on Sec. 12 on the South end of the lands herein described that is suitable for saw logs, with the right to cut and remove the same within one year from this date.

"Party of the second part hereby accepts the terms of this option."

The mineral leases referred to in the option contract described lands by governmental sub-divisions and stated there were embraced therein 18,273 acres.

The resolution of the board of directors under which C. T. Whitman acted for the Lumber Company in signing the mineral leases and option referred to, provided that he "be given the right and empowered to negotiate with the said Wm. A. McVay for the sale of the aforesaid lands and leasing of oil, gas and mineral rights for the benefit of C. T. Whitman Lumber Company, as in his judgment he may deem best, same to be subject to the interest Charles H. Swift may have in this property."

On December 31, 1928, plaintiff McVay, in the presence of two witnesses, made a physical tender to C. T. Whitman, president of the Lumber Company, of $5,000 in gold certificates of the United States, "and offered to execute notes for the balance of the agreed purchase price," which was refused; and affidavits were made and recorded in the conveyance records of St. Landry Parish, by the two witnesses who were present at the tender, on January 22, 1929. McVay had requested the deed to be made to "F. N. Moody and his associates" at $8.50 per acre cash, and plaintiff was to receive $3.50 per acre profit. There was no written acceptance of the option by McVay and all of his representations and discussions with Whitman were oral.

Plaintiff took no further action until July 31, 1934, some five and a half years later, when the bill of complaint in cause No. 605 in equity on the docket of this court, was filed. He made the Lumber Company, Whitman and Swift all parties defendant, and prayed for specific performance of a promise to sell in the option, and in the alternative, for the "amount of damages proven", with a lien on the lands and attacked the sale made by the sheriff of St. Landry Parish under execution to Swift, as "null and void".

On May 24, 1935, a decree pro confesso was entered against all of the defendants, in which it was recited, "that Charles H. Swift, whose residence is given as Chicago, Illinois, and whose address is given as care of Swift & Company of Chicago, Illinois, defendant in and to the above stated cause, has been duly served by publication for six consecutive weeks * * *" and "has failed to file any pleadings"; and on May 29, 1936, a final decree was entered in favor of McVay, in which it was declared that the proof showed the Lumber Company had violated its contract to the damage of plaintiff, "to the extent and in the amount of $63,955.50, at the rate of $3.-50 per acre, which was the profit plaintiff had in said land, plus interest at the rate of five (5%) percent per annum from December 31, 1928, or $20,519.08, thereby making the sum total of $84,474.58, and that complainant is entitled to a lien on the property hereinabove described for the payment of said sum, interest and all costs of this proceeding." Said decree then pronounced judgment in favor of plaintiff and against the Lumber Company for the sum of $84,-474.58, and provided that unless paid within fifteen days, the clerk should, as "special master" proceed to advertise and sell said lands "in the manner as lands are sold under execution" and to credit the proceeds, first to the payment of costs, second, to the satisfaction of plaintiff's judgment, and third, the balance, if any, to defendants "C. T. Whitman Lumber Company, Inc. and Charles H. Swift, as their interests may appear."

Defendant Swift on the ——— day of June, 1936, filed a motion to vacate said decree pro confesso, on the grounds, (1) that he was a non-resident of the state and an inhabitant of Chicago, Illinois, (2) that he had not theretofore made an appearance, (3) he had not been actually personally notified as provided by Section 57 of the Judicial Code, 28 U.S.C.A. § 118, and (4) that he had no knowledge of the suit until it came to his attention by publication of a news item in an Opelousas newspaper, whereupon he took immediate steps to find out what it was about, and to employ counsel to defend him.

On July 20, 1936, said decree was set aside as to Swift. He then filed on August 13, 1936, a motion to dismiss the bill of complaint as to himself on these grounds:

"First. Said bill of complaint fails to allege that plaintiff notified defendant C. T. Whitman Lumber Company, Inc., in writing, within the term stipulated in the option contract declared upon, that he accepted the offer of said C. T. Whitman Lumber Company, Inc. on the terms and conditions therein stipulated as required by the laws of the State of Louisiana in such cases made and provided.

"Second. If a legal tender could take the place of such notice, which is not admitted but on the contrary, denied, then mover shows that the tender made by plaintiff as alleged in Art. 4 of his bill of complaint was not a legal tender under the laws of the State of Louisiana because plaintiff did not tender along with the cash portion of the purchase price his promissory notes duly drawn and signed by him to represent the credit portion of said price nor tender at the same time a warranty deed drawn in accordance with the terms and conditions of said option contract for the signature of defendant C. T. Whitman Lumber Company, Inc."

A supplemental motion to dismiss was filed October 28, 1936, from which the following is quoted:

"1. Because it appears on the face of the bill that the property in dispute has been adjudicated to mover in alleged foreclosure proceedings.

"2. Because the alleged nullity of the sheriff's deed insofar as plaintiff is concerned as set forth in Article 10 of the bill is a mere conclusion of law unsupported by facts;

"3. Because the C. T. Whitman Lumber Company, Inc., title was divested by the foreclosure of a lien or privilege antedating plaintiff's option contract, which was granted in subordination of said lien and privilege as shown by the following facts: (a) the option contract recited that it was entered into by plaintiff and 'C. T. Whitman Lumber Company, a corporation, by C. T. Whitman, President, by virtue of its Board of Directors dated March 17th, 1928'; (b) Said resolution attached to the bill as part of Exhibit 'A' authorizes C. T. Whitman to grant the option to plaintiff 'subject to the interest of Charles H. Swift of Chicago, Illinois, may have in this property'; (c) the lands on which the option was granted are identified in the option itself as follows:—'The lands covered by this option are known as the Charles H. Swift lands'; (d) the bill itself recites that 'One May 28, 1928, (the date of the option) C. T. Whitman Lumber Company, a corporation, by C. T. Whitman, president, by virtue of authority of its board of directors dated March 17, 1928 (the date of the resolution above referred to) being an instrument of writing duly executed, granted to complainant an option', etc. all of which shows that independent of legal subordination by virtue of the State of Louisiana's registry laws, there was a conventional subordination of optionee's rights to those of Swift, and hence when the property was sold at sheriff's sale for less than Swift's claim (bill, article 6) optionee's rights vanished."

On January 11, 1937, this court rendered judgment dismissing said bill as to Swift, as follows:

"It is Therefore, Ordered, Adjudged and Decreed:

"1. That plaintiff's bill as amended, be and it is hereby dismissed in so far as Charles H. Swift and the lands therein described are concerned;

"2. That the clerk of Court and ex-officio recorder of the Parish of St. Landry, State of Louisiana, be, and he hereby is, authorized and directed to cancel and erase from the mortgage records of his office, the judicial mortgage resulting from the registry of the final decree pro confesso herein rendered and signed on May 29th, 1936, in so far as the same affects defendant Charles H. Swift and the property, described in said decree are concerned; and

"3. That all costs be taxed against plaintiff except such as were incurred up to July 20, 1936, when said final decree pro confesso was set aside and held for naught in so far as it affected said Charles H. Swift, and as to those that were necessarily incurred by reason of the fact that said Charles H. Swift was a party defendant shall be taxed against him; to all of which the plaintiff excepts and his exception is allowed."

On appeal by McVay, the Court of Appeals for this circuit, 91 F.2d 208, on July 6, 1937, affirmed the judgment of this court "without prejudice to plaintiff's right to pursue the lands by creditor's bill or other appropriate proceedings as the property of the lumber company." (Page 210.)

At the time plaintiff's original bill was filed in cause No. 605—in equity, on the docket of this court (see 91 F.2d 208) he had neither an enforceable contract nor a

212

lien upon the property, even against the Lumber Company. See authorities cited by the Court of Appeals in its opinion. Hence there was no jurisdiction in equity, either as to Swift or the Lumber Company, and what he obtained in that case was merely a moneyed judgment against the latter, by virtue of personal service and due to its default in not answering the bill and the subsequent proving up of the demand on final decree pro confesso. There was no appeal from this decree by the Lumber Company and the same is now final. The substituted service upon Swift was wholly ineffectual, and that proceeding as to him stands as if it had never been filed. The judgment in no wise bound or affected him. As between plaintiff and defendant Swift in the present case, therefore, the situation stands as, for the first time, plaintiff is endeavoring to prove the claim, and it would seem clear that respondent is entitled to make all valid defenses which he could have made had personal jurisdiction been obtained in the former proceeding, including the question of the validity of the alleged contract, for the breach of which plaintiff obtained a judgment in damages against the Lumber Company. R.C.C. art. 1976. Had that company appeared and defended the cause No. 605 in equity, in view of the express finding of the Court of Appeal, it could have clearly been dismissed for want of equity and the plaintiff would have been relegated to an action at law for damages. In that situation, the question would have at once arisen as to whether damages could have been claimed for the alleged breach of an invalid, or at least ineffective or legally unaccepted offer to sell, in so far as it affected the lands in Swift's possession, and which was the only basis giving him an interest in that litigation.

The option was nothing more than a standing offer to sell during the ninety days it was to run, and as has been held on appeal, that offer could only have been accepted in writing. In the absence of such an acceptance, there was nothing which could either be breached or enforced by either party. Legally, it remained merely an offer, to the end of the period, and not having been accepted in the form required by law, expired by its own limitation. It can scarcely be argued, that the attempted oral acceptance would have given rise to either an action for specific performance or damages on the part of the Lumber Company, since as to it, the promise or obligation to sell was unilateral, and in order for it to claim a breach, it was necessary that that promise should be legally accepted. Can it be said, therefore, that either equitably or legally, no possession having been taken by the optionee or other thing done which might allow the introduction of parole, the Lumber Company could be bound without binding McVay? I think not.

It is undoubtedly true that there are many contracts, affecting real estate even, which although specific performance may not be required, nevertheless form the basis for an action at law in damages for their breach; such as where the party has made it impossible to convey by prior sale or other circumstances has put it beyond his power to perform, But this is not true where the contract is unenforceable under the statute of frauds. See C. J., Vol. 58, p. 1249, Sec. 602, verbo "Specific Performance"; Collins v. Stanbon, 254 Mass. 339, 150 N.E. 90.

So, as I construe the opinion of the court on the former appeal, it simply means that, in view of the fact McVay had by default obtained a moneyed judgment against the Lumber Company, he might bring a creditor's bill, as any judgment creditor could do, to subject property of the debtor to the payment thereof, where the conditions either under the law of the state or in equity, make it possible to reach said property in the hands of third persons. In the light of what has been said above, I am forced to conclude that plaintiff had no valid claim against the Lumber Company prior to its obtaining the default judgment in cause No. 605, and is not entitled, either in equity or under the law of the state, to attack the execution proceedings of Swift, for fraud or otherwise, for the simple reason that the claim did not exist when they took place; R.C.C. Art. 1993, and authorities in footnotes, Dart's 1932 Ed.; and that plaintiff can only prevail in the present suit by showing that the purported transfer to and title in Swift is a pure simulation, and in equity the property still belongs to the Lumber Company. Ideal Savings & Homestead Ass'n, v. Gould, 163 La. 442, 112 So. 40.

The facts which have been detailed above clearly established that Swift sold the property in 1920 to Morrison for a large consideration, exceeding $400,000, of which about one-third was paid in cash,

and the balance was represented by three notes maturing one, two and three years from date; that the Lumber Company within a few months purchased the same property from Morrison, "subject" to the lien and mortgage for the balance due, and thereafter, made partial payments over a long period of years; that beginning with the year 1924, Swift had, first, to redeem the property from the state, which had acquired title for the failure of the Lumber Company to pay taxes for that year, and thereafter paid the taxes up to the execution sale, and there was still due upon the indebtedness at that time some $138,000. It is true that the mortgage was not reinscribed within the ten year period of the state law, but the indebtedness was nevertheless recognized by the Lumber Company by payments, throughout that period, as shown in the above findings of fact, and between the date of the filing of the suit by Swift and the sale it was again recognized in writing by executing with Swift an agreement to repurchase the property within sixty days by payment of the balance due. This was, in effect, a written recognition of the obligation by the debtor, and even a prescribed debt is sufficient consideration for a new promise. C.J. Vol. 13, p. 364, Sec. 230. At the time these things took place, including the filing of the suit, making of the agreement to reconvey and the final sale and purchase by Swift of the lands at execution, McVay was not even a creditor of the Lumber Company, and in no position, even if he had been made party thereto, to oppose the proceedings in the state court. The option to redeem in favor of the Lumber Company was never exercised, and as between it and Swift, the title became absolute in the latter. The proceedings, I am convinced, were real and intended to liquidate Swift's claims against the Lumber Company. There is nothing to dispute the evidence offered by defendant that C. T. Whitman has been employed to look after the lands as care-taker, save the fact that he was president of the Lumber Company, Swift's debtor. This does not rise above the dignity of a suspicion. It is true, Whitman was in court, and not called by either party, and his testimony had been taken de bene esse by defendant, and with the nature of which both parties were presumably familiar. But these facts cannot serve to make what appears from all the other evidence a genuine transaction, a simulation. I can, therefore, see no theory upon which the title and possession of Swift can be said to be simulated.

■ As to the provision in the original contract of sale for the releasing of acreage at the rate of $20 per acre, there is no proof in the record that the Lumber Company or anyone else ever complied with the requirement that for such release request should be made, or as to when the timber was cut off of any particular tract of land. The evidence shows that there was some sixty-five million feet of timber upon the lands in 1920, and at the foreclosure there were still some fifteen million feet standing. I think a fair interpretation of this stipulation was, that after the timber had been cut, the land itself would be released by the payment of $20 per acre, upon written request. Under the facts of the case, it is not possible to attribute any of the funds paid to any particular acreage, since no selections or requests were ever made and I know of no law under which the court could make such imputations. On the contrary, the creditor applied the payments in ordinary course to the debtor to this effect over the years, as to which there was no complaint; and I do not believe plaintiff, who now occupies the position of a judgment creditor against the Lumber Company entirely through its failure to defend, can be heard to claim this right of imputation. In any event, having found that plaintiff had no claim against the Lumber Company until his judgment was obtained by default, and that Swift's title is not simulated, the contention with reference to release of acreage under the original contract of sale, stands upon the same footing as the principal demand.

There should be judgment for the defendant, rejecting plaintiff's demands.

Proper decree should be presented.